---

(19 Misc. Rep. 388.)

## In re HARRIS' WILL.

(Surrogate's Court, Ulster County. February, 1896.)

WILLS—TESTAMENTARY CAPACITY—EVIDENCE.

> Lack of testamentary capacity is not shown merely by evidence that testator, a man over ninety years old, executed the will two days after having broken his thigh, from which accident he suffered great pain, and died in ten days, where he was mentally competent before the accident, and his physician and other witnesses testify that he was competent when the will was executed, and at the time of the execution of the will his attention was particularly called to the fact that nothing was given to the contestants, and he said that the will was as he wished it.

Proceeding for the probate of the will of Samuel Harris, deceased. Granted.

John Rusk (Linson & Van Buren, of counsel), for petitioner William Harris.

Elias M. Ellis (Howard Chipp, Jr., of counsel), for respondents, May I. Ellis and Edith H. Ellis.

BETTS, S. Samuel Harris died at the town of Marlborough, in this county, April 25, 1895, leaving him surviving a son, William Harris, and two granddaughters, May I. Ellis and Edith H. Ellis, daughters of a deceased daughter. A petition was filed in this court on the 10th day of June, 1895, asking for probate of a will, by the said William Harris, the executor named therein. Citations were duly issued, returnable July 2, 1895. Upon the petition of the two infants, Elias M. Ellis, their father, was appointed their special guardian to look after their interests in this proceeding, and he filed objections to the probate of the will in their behalf. Much evidence was taken, and many witnesses examined. The contest was principally upon the testamentary capacity of the deceased, and as to whether he was under undue influence or constraint at the time the paper offered as his will was executed. The proof shows that the will was properly executed in accordance with the laws of this state, and there has been no serious contention over that fact. The will bears date April 18, 1895, and devises and bequeaths all the property of the deceased to his son, William Harris,

and appoints him sole executor thereof. The will was drawn by John Rusk, an attorney, at the village of Marlborough, and witnessed by him and Phebe C. Wygant, the mother of the wife of William Harris. The evidence shows that Mr. Samuel Harris was an old man, upwards of 90 years of age. He had for many years owned a farm in the town of Marlborough, and owned and conducted a store in the village of Ithaca, in this state. For some years his son, William, had resided on and been in charge, under his father, of the farm in Marlborough. The store at Ithaca had been managed in a general way by Elias M. Ellis, a son-in-law of the deceased. The deceased had made his home part of the time in Ithaca and part of the time in Marlborough, and had been the head of the household at each place. A few years ago he took up his residence permanently at Marlborough, his son, William, and family residing with him. On the 16th day of April, 1895, while deceased was walking in his room at his residence, he met with an accident by which he fell and broke his thigh, from which injury he died on the 25th day of April of that year. The day after the accident he executed a deed to his son, William, of the Marlborough property, and the day following—the 18th—he executed the paper which is now before me for probate.

Although an old man, it appears to be conceded that he was entirely competent to execute a will or do any other business up until the time of the accident referred to. It is claimed upon the part of the contestants that the injury and shock to the system of the deceased by this accident was such as to render him incapable mentally of executing a will. There is no doubt but that the deceased was greatly injured; that he suffered much pain, and was, as they all describe him, a very sick man, after this accident. It is not shown, however, by any evidence, that his mind was affected or impaired by the accident which occurred, up to, at least, the time of the execution of the will. On the contrary, the testimony of the subscribing witnesses, and of the physician and of such other witnesses who had any knowledge of the situation, is that he was competent to transact business at that time. He sent his son, William, for Mr. Rusk, to come to his house, on the morning of the 18th, to draw his will. This Mr. Rusk did, receiving instructions from the deceased as to how that will should be drawn, and then drew it in accordance therewith, and it was properly executed. No other person was in the room at the time Mr. Rusk received his instructions. He drew the paper, read it over to the deceased, and the deceased took it, and read it himself. For greater caution, or for some reason not disclosed, Mr. Rusk called his attention twice during the preparation and execution of this will to the fact that he had not provided therein for his granddaughters. The deceased said that he knew that, and that he wanted to will all to Willie; that the will was right, and the way he wanted it.

It was held in the case of Horn v. Pullman, 72 N. Y. 269, that:

"There is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body. Such a rule would be dangerous in the extreme, and the law wisely sus-

tains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property, and the scope, meaning, and effect of the provisions of the will."

I hold the testator to have been shown competent to make a will at the time the paper in question was executed.

The testimony has also been very largely directed on the part of the contestants towards showing that the deceased was under the influence of his son, William, or the family of his son, and that, therefore, the will was not the free act and deed of the deceased. The testator seems to have been a man of remarkable vitality, and of quite considerable executive capacity. He had conducted these two establishments, one at Marlborough and one at Ithaca, both in his own name, and under his immediate direction. His will was law at Ithaca and at Marlborough. The store was conducted under his supervision and direction, and with his means. His son-in-law, Ellis, whose wife died some years ago, and his family, had been supported from the proceeds of that store. His son, William, and his family had been for many years supported from the proceeds of the farm at Marlborough, with, perhaps, some help from the store at Ithaca, or from other means of the deceased. The witnesses all aver that he was a strong-minded and capable man, remarkably reticent in his talk with others concerning his own business affairs. He impressed himself upon those who came in contact with him, and who were produced at this trial, as being a capable man, not requiring, or even submitting to, outside influence or dictation. The son, William, on the contrary, seems to have been a man of easy disposition, content to take life largely as it came to him, satisfied with his father's administration of his own business, and not disposed to interfere therewith. It is no reason for setting aside a will that the deceased has discriminated against or disinherited those who would seem to be the natural objects of his bounty. "A testator has a right to dispose of his estate in any way he may deem best. He is not required to make an equitable will; and he may, if he chooses, exclude his children, or divide his estate among them unequally. The question in all such cases is, was the will the free act of a competent testator?" Horn v. Pullman, supra. "To invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that a party benefited by a will had the motive and opportunity to exert such influence; there must be evidence that he did exert it, and so control the actions of the testator, either by importunities which he could not resist, or by deception, fraud, or other improper means, that the instrument is not really the will of the testator. * * * It is not for us to judge of the justice of the provisions of the will, or of the reasons which the testator had for discriminating. * * * However partial or unjust testator may seem to have been in his testamentary dispositions, if the instrument propounded is actually his will, effect must be given to it." Cudney v. Cudney, 68 N. Y. 148. "The case, then, is one where the testatrix had testamentary

capacity, a present knowledge of the contents of the will, and where, at its execution, she was surrounded by all the guards which the statute has prescribed to prevent fraud and imposition. A will executed under these circumstances can be avoided only by influence amounting to force or coercion, and proof that it was obtained by this coercion. The burden of proving it is on the party who makes the allegation. These principles are well settled." In re Martin's Will, 98 N. Y. 193, and cases therein cited. There is no such force or moral coercion shown or attempted to be shown in this case. The deceased had for many years made his home with his son-in-law, and within a few years had, apparently at his own volition, selected Marlborough, with his son, as his residence. This, perhaps, was not unnatural, in view of the fact that his daughter, who had formerly resided with him at Ithaca, was dead. In connection with the provisions of the will, the selection of Marlborough as his home, and having his son, William, reside with him as his confidant, and as the nearest to him, to execute his wishes in the matter of his business, may be taken as significant.

Much stress is laid by the contestants upon the fact that no will was made, or at least produced, by deceased, until after this injury was received. It is, of course, impossible to show that no prior will had been made, but none is produced. This, however, is not a singular circumstance, as many people of advanced age seem to have an objection to making their wills until some sudden accident or serious sickness calls their attention to the unsettled state of their affairs if death should call them. "And why? Because he thinks himself immortal. All men think all men mortal but themselves." Many letters have been produced showing numerous remittances from deceased to both his son-in-law and his granddaughters. While these amounts are not large, it may well be that the deceased concluded that that branch of his family had had sufficient of his means, and his remaining property should go to his son, William, and his family. We may not enter into the mind of the deceased to ascertain his motives, or to criticise them. He executed his will according to the formalities of the statute. He was apparently of sound mind, and has not been shown to be under any restraint. The will will be admitted to probate, and a decree may be handed up to that effect.

Probate granted.